## BAHR v. MILLER BROTHERS CREAMERY.

1. CONSPIRACY—CIRCUMSTANTIAL EVIDENCE.
   Proof of a conspiracy is generally circumstantial in nature.

2. APPEAL AND ERROR—JUDGMENT NOTWITHSTANDING VERDICT—EVIDENCE.
   An appellant is entitled to have the record viewed from a point of view favorable to him on appeal from judgment notwithstanding the verdict, since that is the view taken of the facts by the jury.

3. CONTRACTS — THIRD-PARTY INTERFERENCE — COMPETITION — MILK SUPPLY.
   Defendant corporate supplier of milk to milk route drivers, which had no contract not to compete with plaintiff who had shortly theretofore obtained his milk supply from such defendant, had an absolute right under our free enterprise system to compete with plaintiff in the field of furnishing milk so long as defendant did not induce the drivers to breach their contracts with plaintiff relative to their routes.

4. TORTS—PROCUREMENT OF BREACH OF CONTRACT—JUSTIFICATION.
   A prima facie case of tort is established when plaintiff proves that defendant intentionally procured a breach of contract between plaintiff and another, and, upon such proof, it becomes incumbent upon defendant to show justification.

5. CONSPIRACY—INDUCEMENT TO BREACH CONTRACT.
   Corporate defendant, who did not approach, solicit, or induce the breaches of contracts between individual defendants and plaintiff, may not be held liable for damages suffered by plaintiff by reason of such breaches, in the absence of evidence

REFERENCES FOR POINTS IN HEADNOTES

[1] 11 Am Jur, Conspiracy § 56.
[2] 3 Am Jur, Appeal and Error §§ 887–889.
[3–7] 11 Am Jur, Conspiracy § 50.
    Liability for procuring breach of contract.  84 ALR 43, 26 ALR2d 1227.
[8] 39 Am Jur, New Trial §§ 142–144.
[9] 14 Am Jur, Costs § 91 et seq.

of conspiracy to commit or induce commission of any unlawful act.

6. CONTRACTS—BREACH—REMEDY—LEASE OF MILK ROUTES.

Lessor of milk routes whose contracts with drivers were breached by latter had remedy against them by way of action for breach of such contracts.

7. CONSPIRACY—MILK ROUTE DRIVERS—EVIDENCE.

Evidence of a joint effort, on part of 3 milk route drivers who leased their routes from plaintiff, to evade their contractual obligations to him would permit jury to find an agreement, or preconceived plan, to do an unlawful act.

8. NEW TRIAL—SUA SPONTE MOTION—EXCESSIVE VERDICT.

New trial as to individual defendants only is ordered on Supreme Court's own motion, where plaintiff's action against such defendants together with corporate defendant was not maintainable against latter and its presence may have been a factor influencing amount of verdict which was so excessive as to suggest some obvious element of mistake or prejudice had entered into the jury's calculations (Court Rule No 72, § 1[g] [1945]).

9. COSTS—NEW TRIAL—FAILURE OF ANY PARTY TO PREVAIL IN ENTIRETY.

No costs are allowed on appeal in action against 3 individual defendants and 1 corporate defendant, where new trial is granted as to 3 individual defendants, since neither party has prevailed in the entirety.

Appeal from Macomb; Spier (James E.), J. Submitted October 6, 1961. (Docket No. 29, Calendar No. 48,507.) Decided December 28, 1961. Rehearing denied March 15, 1962.

Case by Fred T. Bahr, doing business as the Utica Dairy, against Miller Brothers Creamery, a Michigan corporation, Charles G. Marriott, Ervin Aschliman, and Clare Kleinhans for damages to business resulting from conspiracy. Judgment for defendants *non obstante veredicto*. Plaintiff appeals. Affirmed as to defendant Miller Brothers Creamery. Reversed as to individual defendants and remanded for new trial.

*Nathan E. Shur,* for plaintiff.

*Miller, Canfield, Paddock & Stone, Nunnelly & Nunnelly,* and *George F. Roberts (Robert E. Hammell,* of counsel on application for rehearing), for defendants.

Edwards, J.   This is a suit in tort for damage claimed to result from an illegal conspiracy betwixt the Miller Brothers Creamery, a corporation, and 3 individual defendants (Marriott, Aschliman, and Kleinhans) who previously had been milk route drivers handling the products supplied by plaintiff Bahr doing business as the Utica Dairy.

On trial of this matter before a jury in the circuit court of Macomb county, a jury verdict of $40,000 was brought in in favor of plaintiff and against all the defendants.

It appears that plaintiff's counsel conceded before the trial judge that this verdict was in excess of the damages which had been proved since, in argument over a motion filed by defendants for judgment *non obstante veredicto,* the plaintiff responded in part that the verdict "indicates a mathematical miscalculation which can be adjusted with justice and certainty by reducing the judgment to the sum of $30,290."

The trial judge, however, on motion for judgment *non obstante veredicto,* granted the motion and entered judgment of no cause for action.   He wrote an opinion in which he contended that all that defendants had done was to exercise their rights under our system of competitive enterprise to change their contractual relationships with each other.   The trial judge said in part:

"There is absolutely no evidence of any fraud or misrepresentation on the part of any of the defend-

ants, no force or no coercion, no inducements of any kind other than those held out to all other Miller Brothers distributors. No special inducements were held out to the drivers in question. The fact that Miller Brothers arrangements with their independent drivers was more favorable to the drivers than was given by the Utica Dairy to their drivers might be an inducement, but a perfectly legal one and open to all drivers."

The record on appeal before us shows that plaintiff Bahr, doing business under the name of Utica Dairy, took over a milk route in 1944 in the Utica area for which he purchased all of his creamery supplies from defendant Miller Brothers Creamery. The growth in population of the Utica area in the 10 years subsequent to 1944 resulted in such expansion of plaintiff's business that by September of 1954 he had 7 retail milk routes, 1 wholesale milk route, and 1 school milk route, handled by different drivers under individual contracts or understandings between him and the individual concerned. During this period all of the supplies for all of the routes were purchased from defendant Miller Brothers Creamery, and it appears that plaintiff's business in the Utica area represented about 25% of the total sales of defendant Miller Brothers Creamery.

During all of this period it appears that actually plaintiff received a discount of 3/4¢ per point (a point apparently is the equivalent of the price of 1 quart of milk) which he retained. The trial judge found that this discount as remitted by Miller Brothers amounted to $800 to $900 per month. It appears that other independent route drivers not affiliated with the Utica Dairy received the same discount individually. The individual drivers also paid 1¢ per point to plaintiff under the terms of their lease.

Some time in the summer of 1954 plaintiff began contemplating the possibility of switching his source

of supply from Miller Brothers Creamery to Twin Pines Dairy, one of the principal competitors in the area. Having received an indication of more favorable terms from Twin Pines, plaintiff on September 16th gave written notice to Miller Brothers that at the end of 30 days he would cease taking any supplies from them. Shortly thereafter, on September 23d, plaintiff circulated a notice amongst his drivers for them to sign their consent to handle Twin Pines products in lieu of Miller Brothers, and the 3 individual defendants named herein refused to sign this paper and refused to handle Twin Pine products. Actually, the break-off of the Utica Dairy-Miller Brothers relationship occurred on September 28, 1954. Each side claims that the other was responsible for the stopping of the arrangement. It appears that subsequent thereto the 3 individual defendants continued their routes by forming a direct relationship with Miller Brothers and by continuing to service the routes in question.

Plaintiff's basic contention is that by written lease as to 1 defendant, and oral leases with the other 2 defendants, he had leased to them valuable property in the nature of routes, route lists, trucks, and supplies. It is also plaintiff's contention that the written lease with Marriott, and the oral leases with the other 2 individual defendants, provided that none of the 3 of them would directly or indirectly engage in the dairy business within the territories which had been leased to them, for a period of 1 year after date of termination of their lease.

Since State law limits such an arrangement to 90 days,* it is plaintiff's contention that it was the understanding of the parties that the limitation of 90 days would apply. He contends that controversies arose in 1954 between himself and Miller Brothers

---

* CL 1948, § 445.766 (Stat Ann § 28.66). See, also, CL 1948, § 445-.761 (Stat Ann § 28.61).

relating to price-cutting activities in relation to wholesale stops adjacent to Bahr's territory. Plaintiff claims that he had specifically instructed Miller Brothers and their agents not to inform plaintiff's drivers about the rebate which Bahr received from Miller Brothers, but, in fact, in September, 1954, Miller Brothers' sales manager, Anthony Prins, met with the 3 individual defendants and informed them of the Miller Brothers rebate arrangements with Bahr and told them that they were individually entitled to the rebate instead of Bahr. Plaintiff claims that the testimony in the record also warranted the jury finding that Prins told the individual defendants that Miller Brothers would supply them with milk if they came over to Miller Brothers directly, and that they would be getting the "bonus" previously paid to Bahr. On or about Monday, September 27th, the 3 individual defendants came in, turned in their route books to Bahr, and 2 of them turned in their trucks—defendant Marriott being the owner of his. Thereafter they immediately went to work as independent dealers with Miller Brothers, being supplied the next day by Miller Brothers with a line of credit for creamery supplies and 2 of them with trucks.

It appears that in fact the 3 individual defendants continued to service the routes they had previously leased from Bahr, although 2 of them switched routes for a 90-day period. Bahr claims that the testimony allowed the jury to find that all 3 men had substantially prejudiced their customers against him prior to the change-over and that as a result the value of the routes to him after their individual competition had been established was diminished by the total sum of $30,290.

The trial judge, in his opinion granting the motion *non obstante veredicto,* said:

"Plaintiff's remedy, if any, rests in an individual assumpsit action for breach of contract, against each of the defendants severally or such ones he claims breached some existing contract. He retains that right of action which is not disposed of by this present litigation which merely decides that there was no conspiracy."

The chief appellate question is whether or not there were any proofs of conspiracy to induce or do an unlawful act (particularly as to the corporate defendant). *McDonald* v. *Hall,* 203 Mich 431.

We recognize, of course, that proof of a conspiracy is generally circumstantial in nature. *McDonald* v. *Hall, supra.* And, as plaintiff-appellant contends, he is entitled to have the record viewed from a point of view favorable to him since that is the one taken of the facts by the jury. *Davis* v. *New York Central R. Co.,* 348 Mich 262; *Hoffman* v. *Burkhead,* 353 Mich 47.

See, also, *Bishop* v. *New York Central R. Co.,* 348 Mich 345; *Schneider* v. *Pomerville,* 348 Mich 49.

Dealing first with the corporate defendant, it is, of course, obvious that the breach of contract complained of (the 90 days of competition by the drivers in claimed violation of their contracts with plaintiff) was not committed directly by Miller Brothers. It not only did not have any contract not to compete; it had, as the circuit judge pointed out, an absolute right under our system of free enterprise to compete.

Facing this question squarely, plaintiff-appellant's brief relies upon *Wilkinson* v. *Powe,* 300 Mich 275. In that case, plaintiff sued a creamery company, alleging that it induced the breach of plaintiff's contract to haul milk for certain farmers. Plaintiff hauled the milk from certain farmers to defendants' creamery. The plaintiff had either written contracts or oral agreements with all of the farmers involved.

The defendant creamery wrote letters to the farmers in which it asserted that on a certain date the creamery would purchase no more milk from farmers unless it was hauled by defendants' own trucks. Plaintiff, unable to find a market for his milk, abandoned the contracts. The creamery then hauled all of the milk formerly handled by plaintiff. This Court reversed a judgment for defendants *non obstante veredicto,* and held that the evidence supported a verdict for plaintiff. The Court stated (p 282):

"A prima facie case is established when plaintiff proves the intentional procurement of a breach of contract, and, upon such proof, it becomes incumbent upon defendant to show justification. See 84 ALR p 79."

The Court quoted from 2 other cases to establish the general rule that the intentional and knowing inducement of a party to break his contract with another party is a wrongful act, and actionable as such, unless reasonable justification or excuse can be shown, citing *E. L. Husting Co.* v. *Coca Cola Co.,* 205 Wis 356 (237 NW 85, 84 ALR 22), and *Campbell* v. *Gates,* 236 NY 457 (141 NE 914).

In *Wilkinson,* it was held that the question of justification is one for the jury.

This Court further stated (pp 283, 284):

"If the defendants in the instant case had merely refused to accept further delivery of milk by plaintiff, they would have been clearly within their legal rights, although this would have resulted in a breach of contract between plaintiff and the farmers. But defendants did more. Their letters of May 29th and June 1st show active solicitation of a breach of the contract and their refusal to accept delivery of milk was merely another step in bringing about the breach."

Cited in the *Wilkinson Case* was *Knickerbocker Ice Co.* v. *Gardiner Dairy Co.,* 107 Md 556 (69 A 405, 16 LRA NS 746), which involved a situation substantially similar to that in *Wilkinson.* In *Gardiner,* plaintiff Gardiner Company entered into a contract with the Sumwalt Company to deliver a certain amount of ice daily to plaintiff's plant. The Sumwalt Company was then being supplied by defendant Knickerbocker Ice Company. The latter company, when it learned of the contract between Sumwalt and Gardiner, refused to sell ice to Sumwalt unless it broke its contract with Gardiner. Gardiner was then forced to purchase ice directly from Knickerbocker at a higher price. The Maryland court held that plaintiff Gardiner had stated a cause of action against Knickerbocker (pp 567, 568):

"If the Knickerbocker company had simply refused to furnish the Sumwalt company with ice the Gardiner company would not for that reason alone have a remedy against the Knickerbocker company. Such action would not necessarily be unlawful or wrongful, but if the Knickerbocker company refused to furnish the Sumwalt company if it furnished the Gardiner company, although it knew it was under contract to do so, in order to get the business of the Gardiner company for itself on its own terms, then it was unlawful to thus interfere with the contract between the Sumwalt company and the Gardiner company.

"So without further pursuing that branch of the case we are of the opinion that the demurrer was properly overruled, as the declaration stated an actionable wrong, even if there had been no express allegation of malice."

In *Wilkinson* and in *Knickerbocker,* the defendants' acts were unlawful because done to accomplish an unlawful purpose, *i.e.,* to bring about a breach of contract.

To a like effect is *Imperial Ice Co.* v. *Rossier,* 18 Cal2d 33 (112 P2d 631). There, the plaintiff, an ice distributor, filed a bill against the defendant, an ice manufacturer, seeking an injunction restraining defendant from procuring the breach of a contract not to compete. When plaintiff purchased the distributorship, the seller had contracted not to compete in the same area so long as plaintiff was in business. The plaintiff's complaint alleged that the defendant intentionally and actively induced the seller to violate his contract in order to sell ice to it. The California supreme court, speaking through Mr. Justice Traynor, held that this complaint stated a cause of action (pp 35–37):

"Most jurisdictions also hold that an action will lie for inducing a breach of contract by the use of moral, social, or economic pressures, in themselves lawful, unless there is sufficient justification for such inducement. (See cases cited in 84 ALR 55; 24 Cal L Rev 208, 209; see Sayre, Inducing Breach of Contract, 36 Harv L Rev 663, 671; Carpenter, Interference With Contractual Relations, 41 Harv L Rev 728, 732; 4 Restatement, Torts, § 766.)     *     *     *

"It is well established, however, that a person is not justified in inducing a breach of contract simply because he is in competition with one of the parties to the contract and seeks to further his own economic advantage at the expense of the other. (See cases cited in 84 ALR 83; 24 Cal L Rev 208, 211; see 4 Restatement, Torts, § 768[2].)     *     *     *

"A party may not, however, under the guise of competition actively and affirmatively induce the breach of a competitor's contract in order to secure an economic advantage over that competitor."

The court went on to say (p 39):

"Had defendants merely sold ice to Coker without actively inducing him to violate his contract, his distribution of the ice in the forbidden territory in violation of his contract would not then have ren-

·dered defendants liable. They may carry on their business of selling ice as usual without incurring liability for breaches of contract by their customers. It is necessary to prove that they intentionally and actively induced the breach."

Plaintiff's reliance on these cases is misplaced. They do clearly hold that a cause of action is available where a defendant has induced a third party to break a contract with plaintiff. But in each case there was proof (or accepted allegations) of active solicitation and instigation of the breach on the part of the defendants. And in each case the court qualified its holding by stating that had the defendants not been the instigators, they would not have been liable.

There is no testimony in this record from which it can be asserted or inferred that the corporate defendant approached, solicited or induced the breach of contract by the individual defendants. On the contrary, the approach appears to have been made wholly from the other direction, as indicated in the following events:

September 16, 1954—Plaintiff Bahr served 30-day notice of intent to discontinue purchase of defendant Miller Brothers' products;

September 18, 1954—Aschliman and Kleinhans called Miller Brothers and arranged to talk to the sales manager at his home that night. They questioned him concerning the method of operation of Miller Brothers' independent milkmen;

September 22, 1954 (on or about)—Marriott met with Miller Brothers' sales manager at his own request to discuss the situation and inquire about the possibility of his starting an independent route for Miller Brothers.

On or about this same date, Aschliman and Kleinhans again went over to see the sales manager. At

none of these first meetings were any arrangements made between the parties;

September 23, 1954—Plaintiff Bahr issued a memo to his drivers, stating that he was discontinuing relations with Miller Brothers, and would begin in the near future to distribute Twin Pines products. At this time, the 3 individual defendants told plaintiff that they did not want to deliver Twin Pines products and would not make the switch;

September 25, 1954—Bahr went to Miller Brothers' office and, after discussion with one of the officers (Zagel), agreed to move up termination date to September 28th;

September 26, 1954—Kleinhans and Aschliman turned in route books to plaintiff and quit;

September 27, 1954—Marriott quit. On that evening, the 3 drivers again went over to see Miller Brothers' sales manager, and at this time made final arrangements to go to work for Miller Brothers.

While the above facts appear to be undisputed, plaintiff-appellant relies strongly upon the fact that Miller Brothers' agents disclosed to drivers the fact that plaintiff was enjoying a "bonus" arrangement with them, which they normally passed on to their own independent drivers. The record, however, indicates in this regard that this information was not volunteered, but was given as a result of questioning by the drivers. Although plaintiff-appellant asserts that he asked Miller Brothers not to disclose the financial arrangement, there is no indication of a legal duty not to do so, particularly since it was obvious that plaintiff was about to form a new creamery supply relationship which would have the effect of eliminating a substantial part of defendant Miller Brothers' sales.

As to the corporate defendant, we agree with the circuit judge that there is no evidence of conspiracy

to commit or induce commission of any unlawful act.

There were, of course, proofs from which the jury could have found the existence of 90-day contracts not to compete with plaintiff, and proofs from which the jury could have found breach of such contracts. As the circuit judge pointed out, plaintiff's remedy in this regard (and one still available to him if he elects it) is an action against the individual defendants for breach of contract.

There is, however, some rather dramatic evidence which occasions our declining to affirm dismissal of this conspiracy action as to the other individual defendants. Defendants Kleinhans and Marriott switched routes during the 90-day period following the termination of their relationships with plaintiff. The jury certainly could have found that this action was an obvious, if ineffective, joint effort to evade their contractual obligations. While defendant Aschliman did not participate in this route switching arrangement, he did continue to compete on his own route, and he was a party to the first approach (and subsequent ones) by the drivers to Miller Brothers. There was, therefore, evidence from which the jury could have found an agreement, or preconceived plan, to do an unlawful act. *McDonald* v. *Hall, supra; Popielarski* v. *Jacobson,* 336 Mich 672.

See, also, 11 Am Jur, Conspiracy, §§ 3, 45.

This view of the facts would lead us to conclude that the record viewed from a point of view favorable to plaintiff contained support for the jury's finding of a verdict against the individual defendants, and hence would suggest affirmance. The amount of the verdict prevents our doing so. The trial judge noted that the $40,000 verdict was twice what plaintiff's trial counsel had sought in his closing argument. Plaintiff's trial counsel, after the rendering of the $40,000 verdict, argued for a re-

mittitur down to the figure of $30,290. We find the $40,000 figure so excessive, when compared to the proofs of actual damage in the appellant's record, as to suggest that some obvious element of mistake or prejudice entered into the jury's calculations. That element may have been the presence of the corporate defendant.

Defendants have made no motion for new trial. But in the interest of justice, and on our own motion (see Michigan Court Rule No 72, § 1[g] [1945]), we feel constrained to reverse and remand for new trial as to the individual defendants only. See *St. John* v. *Nichols,* 331 Mich 148, 158.

Affirmed as to defendant Miller Brothers Creamery. Reversed and remanded as to individual defendants. No costs, neither party having prevailed in the entirety.

Dethmers, C. J., and Carr, Kelly, Black, Kavanagh, and Souris, JJ., concurred.

Otis M. Smith, J., took no part in the decision of this case.