454 F.2d 1233
 UNIROYAL, INC., Plaintiff and Counter-Defendant, Appellee,
v.
Philip MUMFORD, a/k/a Phil Mumford, d/b/a Market Tire
Company, a Division of Allied Rubber Associates,
Co., Defendant and Counter-Plaintiff, Appellant.
 No. 18957.
 United States Court of Appeals,
Seventh Circuit.
 Jan. 14, 1972.
 
 Dom J. Rizzi, Marshall J. Cooper, Chicago, Ill., for defendant and counterplaintiff, appellant; Frank M. Greenfield, Chicago, Ill., of counsel.
 Paul H. LaRue, James E. Hastings, Chicago, Ill., for plaintiff and counterdefendant-appellee; Chadwell, Keck, Kayser & Ruggles, Chicago, Ill., of counsel.
 Before DUFFY, HASTINGS and KNOCH, Senior Circuit Judges.
 KNOCH, Senior Circuit Judge.
 
 
 1
 This appeal arose out of a suit brought by plaintiff and counter-defendant, appellee, Uniroyal, Inc. The parties ultimately agreed that judgment in favor of Uniroyal be entered for a stipulated amount. Defendant and counterplaintiff, appellant, Philip Mumford, a/k/a Phil Mumford, d/b/a Market Tire Company, a Division of Allied Rubber Associated Company, filed a counterclaim charging wrongful and malicious actions by Uniroyal to cause Mr. Mumford's two major customers to cease doing business with him, thus forcing his termination of his tire dealership under a franchise from Uniroyal.
 
 
 2
 The District Judge, trying the counterclaim, as amended, without a jury, made findings of fact and drew conclusions of law favorable to Uniroyal.
 
 
 3
 Mr. Mumford has appealed from dismissal of his counterclaim. We have studied the record. There was evidence to support the following set of facts.
 
 
 4
 Mr. Mumford who had been in the used tire business in Chicago, learned in July 1967 of the availability for sale of the assets of Market Tire Company, formerly operated by Uniroyal in Detroit as a commercial truck tire outlet. These assets included facilities for selling new tires, recapping tire casings and servicing truck tires. Uniroyal was willing to sell the physical assets or franchise a new operation. Mr. Mumford bought the assets. He examined the invoices and sales records of the failed operation by Uniroyal and discussed the possibility of reopening Market Tire (as an independent dealer under a Uniroyal franchise) with Leslie Wood, Uniroyal's Detroit Sales District Manager, and Eugene Tower, then Uniroyal's Regional Manager, shortly after which Mr. Mumford executed a franchise agreement.
 
 
 5
 In the course of the preliminary discussions, Mr. Mumford was shown Market Tire's Bielfield Division customer list. Harry Bielfield had closed his own tire dealer business in 1963 and had become a contract salesman for Market Tire. Mr. Mumford retained him under his operation.
 
 
 6
 One conflict in the testimony apparently occurred with respect to discounts. The District Judge found that when Messrs. Wood and Tower discussed this matter with Mr. Mumford, it was agreed that for F. J. Boutell Co., an automobile hauling company, Market Tire would receive a 5% discount and Mr. Bielfield, a 4% discount from the list price of the tires, but no agreement that these discounts would become guaranteed "commissions" on any such prices as Market Tire and Mr. Bielfield might elect to charge their customers, which they were at liberty to set.
 
 
 7
 Market Tire could, at its option, pass on any part of these 4% and 5% discounts from list price to reduce its price to Boutell. It evidently did so in filling some of its last orders. There was testimony that it was common practice for commercial tire dealers to sell new tires at reduced profit to maintain the more profitable service and recapping business.
 
 
 8
 There was no undertaking by Uniroyal either (1) to sell directly to Boutell only at prices lower than those elected by Market Tire, or (2) to sell to Market Tire at unprofitable levels to enable Market Tire to retain Boutell as a customer if the latter were offered lower prices by competitors.
 
 
 9
 The two Uniroyal representatives also promised to assist where possible in meeting competitive market conditions subject to approval from their headquarters in New York, which in the past had sometimes withheld such approval.
 
 
 10
 At the time of these discussions, Uniroyal was shut down because of a strike in the tire industry. When the strike ended in August 1967, there was an industrywide price increase. Mr. Mumford notified his customers of the approximately 5% increase on new tires, which all but Boutell paid.
 
 
 11
 For the remainder of 1967, Market Tire was filling a backlog of Boutell orders received prior to the price increase. As Market Tire had this backlog of orders received at the old price, it continued through 1967 to fill Boutell's orders at the old lower prices. Uniroyal invoiced Market Tire at the former prices on tires sold to Boutell, granting an additional 5% discount from the new list price in accordance with its policy on tires ordered prior to the price increase.
 
 
 12
 In the fall of 1967, while Mr. Bielfield was ill and out of the city, Boutell's buyer told Stephen Maleski, Uniroyal's Detroit District Manager of Automobile Sales, that he was dissatisfied with Market Tire and was interested in dealing directly with Uniroyal. Meanwhile Uniroyal was seeking New York Headquarters' approval for price assistance to Market Tire on Boutell sales, which was denied.
 
 
 13
 Mr. Mumford testified that Boutell had asked him to meet Goodyear Tire and Rubber Company's lower prices.
 
 
 14
 Invoices for 1968 did not include the prior price protection discount of the backlog orders of 1967. They showed only the 4% and 5% discounts mentioned above. Boutell ceased business with Market Tire after January 1968.
 
 
 15
 In March 1968, Uniroyal's new district manager in Detroit, noting that no business was being done with Boutell, telephoned its buyer who reported attractive direct prices quoted by Goodyear and General Tire and Rubber Company approximately 5% lower than Uniroyal's. In mid-April 1968, acting on this information, Uniroyal began direct selling to Boutell, meeting the competition's prices. The franchise agreement did not prohibit such direct sales.
 
 
 16
 Sealtest Foods was a customer of the Bielfield Division of Market Tire Co. Mr. Wood had indicated that he had no objection to Mr. Mumford's disposing of a $50,000 inventory of Dunlap Tires which had been brought from the prior operation in Chicago. Mr. Bielfield arranged for Sealtest to put Dunlap tires on their trucks in place of the Uniroyal tires Sealtest had been buying.
 
 
 17
 As a result of ill health Mr. Bielfield retired in the winter of 1967-68. Early in March 1968 Sealtest transferred its business to another Uniroyal tire dealer in Detroit. Although Mr. Mumford testified to the loss of Mr. Bielfield's admittedly important sales efforts, he attributed the change by Sealtest to the direct intervention of the new Detroit District Manager, Gerald Labella. He testified that he asked Mr. Labella why the latter had taken Sealtest away and Mr. Labella had said Market Tire should have known better than to sell Sealtest Dunlap tires. In his testimony at the trial, Mr. Labella denied the implication that he had any power to effect the change. He testified that Sealtest had been using Uniroyal tires for many years and that he could only conjecture that the change had been a result of Sealtest's wish to continue with Uniroyal tires. He denied ever speaking to any official of Sealtest or to any other dealer about taking over the Sealtest business and knew of no one in his organization who might have done so. The Trial Judge who heard and saw the witness evidently credited his statements.
 
 
 18
 In May 1968, Mr. Mumford closed Market Tire. Prior to disposing of the physical assets at auction, Uniroyal and Mr. Mumford agreed half the proceeds would be applied to Mr. Mumford's account with Uniroyal.
 
 
 19
 It is Mr. Mumford's view that after persuading him to leave his Chicago business, for which he had at the outset bought the assets of Market Tire, and enticing him to reopen as a Uniroyal franchise dealer, Uniroyal maliciously appropriated his two main accounts causing him to go out of business.
 
 
 20
 We are here faced with several issues of fact. The District Court found that Uniroyal did not induce the two customers to withdraw from Market Tire. Mr. Mumford asserts that these findings are unsupported by the record and against the manifest weight of the evidence. We cannot agree.
 
 
 21
 It is axiomatic that the Court will not set aside a trial judge's findings of fact unless it finds them clearly erroneous, having due respect for the trial judge's superior opportunity to judge issues of credibility. Federal Rules of Civil Procedure 52(a). Zenith Radio Corp. v. Hazeltine Research, Inc., 1969, 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L. Ed.2d 129.
 
 
 22
 We must look to the evidence most favorable to the District Judge's findings and to such reasonable inferences as may be drawn therefrom. Lewis Mach. Co. v. Aztec Lines, 7 Cir., 1949, 172 F.2d 746, 748.
 
 
 23
 Mr. Mumford, as indicated, drew an inference of active solicitation from some comments made by Mr. Labella. The District Judge declined (reasonably) to draw that inference from the statements. There was no other evidence to support a finding of any active solicitation or inducement to meet the prerequisite of liability in Michigan for wrongful interference. Bahr v. Miller Brothers Creamery, 1961, 365 Mich. 415, 112 N.W.2d 463, 468.
 
 
 24
 When the two customers had ceased dealing with Market Tire, Uniroyal was not obliged to refrain from efforts to retain them as customers for Uniroyal.
 
 
 25
 After reviewing the record in the light of the arguments of the parties, we conclude that the judgment of the District Court must be affirmed.
 
 
 26
 Affirmed.