**Gary L. MONETTE d/b/a Gary's International Bread, Plaintiff–Appellee,**

v.

**AM–7–7 BAKING COMPANY, LTD. d/b/a International Baking Company and Antonio Malandruccolo, Defendants–Appellants.**

No. 90–1413.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 30, 1990.

Decided April 5, 1991.

Jerry R. Swift (argued), Keith M. Aretha, Eames, Wilcox, Mastej, Bryant, Swift & Riddell, Detroit, Mich., for plaintiff-appellee.

David B. Rosenberg (argued), Rosenberg & Nelson, Southfield, Mich., for defendants-appellants.

Before NORRIS, Circuit Judge, WELLFORD,* Senior Circuit Judge, and FORESTER,** District Judge.

---

* The Honorable Harry W. Wellford assumed senior status on January 21, 1991.

** The Honorable Karl S. Forester, United States District Judge for the Eastern District of Kentucky, sitting by designation.

FORESTER, District Judge.

This is a direct appeal from a Memorandum Opinion and Order denying defendants' motions for a judgment notwithstanding the verdict and for a new trial. Plaintiff-appellee, Gary L. Monette d/b/a Gary's International Bread ["Monette"], filed an action in the Eastern District of Michigan on April 26, 1989 against defendants-appellants, AM–7–7 Baking Company, Ltd., an Ontario, Canada corporation d/b/a International Baking Company ["International Baking"] and Antonio Malandruccolo [collectively "Defendants"]. Malandruccolo is the president and sole shareholder of International Baking. Monette's complaint alleged tort counts of intentional interference with prospective economic advantage; interference with contractual relations; defamation; and misuse of trade secrets. Jurisdiction is based upon diversity of citizenship between the parties. Monette essentially claims that Defendants used improper and unlawful means to destroy his bread route business so that Defendants could usurp that business for their own benefit.

The matter was tried to a jury on November 2, 1989. Monette abandoned his claim for defamation shortly before trial. At the close of Monette's proof, Defendants moved for a directed verdict on the three remaining counts. The trial court dismissed the counts on interference with contractual relations and misuse of trade secrets. The matter went to the jury on the sole claim of intentional interference with prospective economic advantage. The parties filed joint jury instructions with the court on the day of trial. The jury returned a verdict in favor of Monette that day and judgment was entered on the jury verdict in favor of Monette for $60,000 in damages on November 9, 1989.[1] The judgment was joint and several as to the Defendants. Defendants moved for a judgment notwithstanding the verdict and for a new trial. The trial court denied the motions in a memorandum opinion and order dated March 15, 1990. On March 29, 1990, the Defendants filed their notice of appeal contesting the memorandum opinion and order that denied Defendants' motions for a JNOV and a new trial. This Court affirms.

## FACTUAL BACKGROUND

On or about September 30, 1988, Monette purchased a bread route owned by Sam Picarella for $28,000. Picarella had owned the route for about six and one-half years, having purchased the route from a former owner for $30,000. Although the customers on the route would change from time to time, the route had been in existence since prior to 1977. For the $28,000 price, Monette purchased a truck and a list of customers that Picarella had been servicing.

Two-thirds of the bread products that Monette sold to his retail customers were purchased from International Baking, an Italian bread baking business located in Windsor, Ontario in Canada. Other breads not from International Baking, Syrian or pita bread from Fran's in Windsor and hamburger and hot dog buns from Brown's Bakery in Detroit, made up the remaining third of the sales. Monette purchased the bread wholesale from International Baking and the other suppliers, sold it to his retail customers at a higher price, and earned a profit on the difference. The original owner of the bread route, his successor Picarella, and Monette did not have a contract with International Baking for the purchase and resale of the bread products. Thus, International Baking had no obligation to sell or to provide Monette with bread products, and Monette was likewise not commit-

---

1. Judge Wellford contends in his dissent that the $60,000 jury award in favor of Monette is grossly excessive and unsupported by the evidence. However, the Defendants did not raise an issue in their motions for a JNOV or a new trial in the district court as to any impropriety in the amount of the verdict, nor do they raise such an issue on appeal. The record on appeal does not indicate any error in the jury award. Since the record designated on this appeal is insufficient to conclude error, the Court assumes from the Defendants' indifference that no error exists with the amount of the verdict.

ted to buy any products from International Baking. The parties merely had an ongoing relationship in which they voluntarily transacted business—the sale and purchase of bread products—from day to day.

Within about three weeks after Monette purchased the route from Picarella, Malandruccolo approached Picarella to determine if Picarella would take the bread route back from Monette. Picarella stated that he did not want the route. Malandruccolo replied that he did not like Monette and stated that "I am going to boot him out of here."

Monette testified that he was harassed by Malandruccolo and other personnel of International Baking. Harassment consisted of refusing to talk to Monette on some occasions, yelling at Monette on other occasions, and making unreasonable demands upon Monette. Defendants claim that Monette's sales were down, although Monette's evidence established that sales had not diminished.

International Baking did not have a complete list of the names of Monette's customers. In November 1988, International Baking sent one of its employees, Earl Bondy, to accompany Monette on the route under the pretext of helping Monette increase sales of bread. Monette was told Bondy was to accompany Monette on the route for one week, although Bondy actually accompanied Monette for only one day. During the course of the day Monette discovered that Bondy was compiling a list of Monette's customers. Bondy assured Monette that he was compiling a list of the customers merely as evidence to International Baking that Bondy had done his job of talking with the customers. Monette contends that the intention of Defendants was to trick Monette into letting Bondy compile a list of his customers so that International Baking could steal the route away from Monette.

On February 21, 1989, Defendants, without warning, informed Monette that International Baking would no longer sell bread to him. On that same day, Defendants used the customer list they had obtained through Bondy to locate Monette's retail customers. Malandruccolo and Bondy visited Monette's retail customers in the United States and told each that International Baking would be taking over the route, that they no longer could buy the bread of International Baking from Monette, and that International Baking would sell the products directly to them. When Monette asked if International Baking would be taking over the pita bread and buns from rival bakeries which Monette had been purchasing, Earl Bondy responded, "Hey, that is part of the route."

International Baking thereafter effectively assumed Monette's bread route. Bread products were delivered to the retail customers by a driver employed by International Baking. In addition, various bread products previously purchased by Monette from rival bakeries were replaced by similar products manufactured by International Baking. Once Monette learned that International Baking had ceased selling bread products to him, he asked his retail customers if they would accept an alternative product in place of International Baking breads. While some customers indicated interest in an alternative product and some did not, Monette concluded that he could not find a replacement product in time to adequately serve his customers. Monette accordingly concluded that his bread route business had failed, and he was forced to abandon the route. Although some evidence at trial indicated that Monette was interested in getting out of the bread route business, Monette testified that he was considering selling the route rather than abandoning it. He further testified that his interest in selling the business was due to the harassment he received from Defendants and other personnel of International Baking.

## DISCUSSION

The issue before the Court is whether the district court properly denied Defendants' motions for a judgment notwithstanding the verdict or for a new trial. In other words, the issue is whether Monette introduced sufficient evidence at trial to prove Defendants intentionally interfered

with prospective economic advantage under Michigan law.

Monette's theory is that he proved all the elements of the tort of intentional interference with prospective economic advantage. Defendants' main arguments are that no evidence was introduced at trial that Defendants pressured Monette's retail customers to cease buying bread from Monette, and, in any event, that International Baking was justified in terminating its relationship with Monette because he was not servicing the route effectively.

Monette responds that, under Michigan law, he merely needed to prove that Defendants intentionally committed acts that caused Monette's customers to discontinue their business relationships with Monette and that such interference by Defendants was improper or unjustified. The evidence was uncontroverted at trial that, after February 21, 1989, International Baking refused to sell Monette any bread products. Monette testified that this event caused his bread route to fail. Furthermore, evidence was presented that Defendants used fraudulent and deceptive means to coerce Monette into disclosing his customers to Defendants so that Defendants could take over the bread route for their own benefit. Monette contends, therefore, that he presented sufficient evidence for the trial court to submit the case to the jury. The jury having concluded that Defendants intentionally interfered with the relationship between Monette and his customers, and that such interference by Defendants was improper, Monette insists that the trial court properly denied Defendants' motions for a judgment notwithstanding the verdict or for a new trial.

## A. Standard of Review

■ On a motion for a judgment notwithstanding the verdict or for a directed verdict, the district court must determine whether there was sufficient evidence presented to raise a material issue of fact for the jury. *O'Neill v. Kiledjian*, 511 F.2d 511, 513 (6th Cir.1975). As applied in this context, "sufficient evidence" will be found unless, when viewed in the light of those inferences most favorable to the nonmovant, there is either a complete absence of proof on the issues or no controverted issues of fact upon which reasonable persons could differ. *Sawchik v. E.I. DuPont DeNemours & Co.*, 783 F.2d 635, 636 (6th Cir.1986). The determination is one of law to be made in the first instance by the district court. The standard remains the same when the trial court's decision is reviewed on appeal.

■ The grant or denial of a new trial is purely within the discretion of the trial court. The trial court's decision will not be reversed except upon a showing of abuse of discretion. *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir.1989). "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Id.*

## B. Intentional Interference With Prospective Economic Advantage

■ Jurisdiction in this case is based upon diversity of citizenship between the parties. In diversity cases, a federal court must apply state law "in accordance with the then controlling decision of the highest state court." *U.S. v. Anderson County*, 761 F.2d 1169, 1173 (6th Cir.1985), *cert. denied*, 474 U.S. 919, 106 S.Ct. 248, 88 L.Ed.2d 256 (1985) (quoting *Vandenbark v. Owens–Illinois Glass Co.*, 311 U.S. 538, 543, 61 S.Ct. 347, 350, 85 L.Ed. 327 (1941)). "If the forum state's highest court has not addressed the issue, the federal court must ascertain from all available data, including the decisional law of the state's lower courts, restatements of law, law review commentaries, and decisions from other jurisdictions on the 'majority' rule, what the state's highest court would decide if faced with the issue." *Grantham & Mann v. Am. Safety Prod.*, 831 F.2d 596, 608 (6th Cir.1987). Although a decision by a lower state court is not necessarily controlling where the highest state court has not yet spoken, the opinion of an intermediate appellate state court is not to be disregarded unless the federal court is convinced by other persuasive data that the highest state

court would decide otherwise. *Id.* at 608–09.

The tort of intentional interference with contractual relations differs from intentional interference with prospective economic advantage. The former centers on interference with an actual contractual relationship, whereas the latter tort does not require the existence of an enforceable contract. In fact, "[i]t is not necessary that the prospective relation be expected to be reduced to a formal, binding contract." Restatement (Second) of Torts § 766B comment c (1979).

In order to establish interference with a prospective economic advantage, the plaintiff must show:

(1) the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy;

(2) that defendant knew of the business relationship;

(3) that defendant intentionally interfered by improperly inducing or causing a breach or termination of the relationship or expectancy; and

(4) that defendant's improper or unjustified interference resulted in injury to the plaintiff. *Northern Plumbing & Heating, Inc. v. Henderson Bros.,* 83 Mich.App. 84, 93, 268 N.W.2d 296, 299 (1978) (citing 45 Am.Jur.2d *Interference* § 50). "One is liable for commission of this tort who interferes with business relations of another, both existing and prospective, by inducing a third person not to enter into *or continue a business relation with another or by preventing a third person from continuing a business with another.*" 268 N.W.2d at 299 (emphasis added).

In this regard, the parties essentially dispute what constitutes "improper inducement" under Michigan law. Defendants argue on appeal that the evidence was uncontroverted that they did not directly contact Monette's customers to encourage them to discontinue doing business with Monette; in other words, there was no active solicitation. Defendants further argue that Monette failed to prove any direct inducement of these customers. Monette,

in response, argues that Michigan does not require that a defendant actually contact the parties with whom the plaintiff does business. He contends, therefore, that conduct that indirectly pressures third parties to end their dealings with plaintiff will satisfy this third element.

Defendants have cited the cases of *Bahr v. Miller Brothers Creamery,* 365 Mich. 415, 112 N.W.2d 463 (1961), and *Feldman v. Green,* 138 Mich.App. 360, 360 N.W.2d 881 (1984), as controlling. Monette maintains, and the trial court agreed, that the Michigan case closest on point to the present matter is *Wilkinson v. Powe,* 300 Mich. 275, 1 N.W.2d 539 (1942). Monette argues that neither the *Bahr* case, the *Feldman* case, nor any other subsequent Michigan decision has attempted to change or to erode the *Wilkinson* decision.

In *Wilkinson,* the Michigan Supreme Court reinstated a jury verdict for the plaintiff finding that the defendants were liable for procuring a breach of the plaintiff's contract to haul the milk of certain dairy farmers. The defendants owned a creamery to which the milk was hauled. They informed certain farmers by letter that the creamery would not accept the farmers' milk unless the milk was hauled by the defendants' own trucks. Following a meeting by some of the farmers, the defendants sent another letter to them agreeing to allow the plaintiff to haul milk for only an additional nine days but thereafter implementing their new hauling plan. The farmers discontinued their relationship with the plaintiff and allowed the defendants to haul their milk. The plaintiff's business failed as a result. 1 N.W.2d at 540–41.

At trial, the defendants argued that they took over the routes because the plaintiff was late with his deliveries and because he delivered the milk in an unsatisfactory condition. The trial judge granted a judgment notwithstanding the verdict based upon his view that the defendants had a superior or absolute right to discontinue the supply of milk at any time and that no showing of justification was therefore necessary. *Id.* at 541–42.

The Michigan Supreme Court reversed. The court noted that "[t]he right to perform a contract and to reap the profits resulting therefrom, and the right to compel performance by the other party, is generally regarded as a property right." *Id.* at 543. The court further stated that "[a] prima facie case is established when plaintiff proves the intentional procurement of a breach of contract, and, upon such proof, it becomes incumbent upon defendant to show justification." *Id.* at 542. However, no specific definition can be formulated as to what will constitute justification, "and it is usually held that this question is one for the jury." *Id.*

The court rejected the defendants' argument that they had a "superior" or "absolute" right to refuse to accept further delivery of milk from the plaintiff based upon the argument that an entrepreneur in our free enterprise system can refuse to buy or sell from whomever he pleases:

> If the defendants in the instant case had merely refused to accept further delivery of milk by plaintiff, they would have been clearly within their legal rights, although this would have resulted in a breach of contract between plaintiff and the farmers. But defendants did more. Their letters of May 29th and June 1st show active solicitation of a breach of the contract and their refusal to accept delivery of milk was merely another step in bringing about the breach.

*Id.* at 542–43. The court stated that the defendants' refusal to accept further deliveries of milk by plaintiff was wrongful "because it was done to accomplish an unlawful purpose, i.e., to bring about a breach of contract." *Id.* at 543.

The *Wilkinson* court concluded that the fact that the plaintiff did not have contracts with some of his customers was irrelevant:

> That a few of the farmers on the routes had not signed the contracts is beside the point. Plaintiff certainly had an understanding with them, and there is no testimony to show that they would not have continued to employ plaintiff to haul

their milk if defendants had not interfered.

*Id.* Finally, the court held that proof of proximate causation was complete upon proof of defendants' unlawful purpose:

> It therefore follows that the problem of proximate cause disappears from consideration in the case. Defendants cannot be heard to say that they should not be held liable for the injury caused plaintiff by their unlawful acts merely because they could have caused the same injury by a lawful act.

*Id.*

▪ Perhaps the argument that the Defendants advance most strongly is that no direct evidence introduced at trial indicated that Defendants actively solicited Monette's retail customers to discontinue doing business with Monette. In other words, the evidence did not prove that Defendants or their agents specifically told the retail customers not to buy from Monette. However, no proof of such solicitation is required under Michigan law to state a claim for intentional interference with prospective economic advantage. If the defendant's conduct interfered with the plaintiff's business expectancy and if that interference was improper or unjustified, such evidence alone is enough to establish a *prima facie* case for intentional interference. Moreover, Monette introduced evidence that Defendants actively solicited the retail customers not to buy from Monette.

▪ The Defendants attempt to distance themselves from the deceitful acts by which they obtained Monette's customer list. They argue that the underhanded acts do not constitute the interference contemplated by the tort. They argue, instead, that interference with the business relation by directly and actively soliciting the business of the customers is the only conduct actionable under the tort.

This Court is confident, however, after having reviewed the pertinent Michigan decisions, that the deceit utilized in obtaining Monette's customer list is sufficiently part and parcel of the interference proscribed by the tort under Michigan law. The entire sequence of events must be viewed as a

whole, in other words, as a single block of conduct. The tort analysis then centers on whether the conduct is improper and unjustified. In this regard, the inquiry concentrates on the means employed, the motive and the intent of the interferer, and the fairness of the conduct under the circumstances.

This Court agrees with the district court's conclusion that "conduct which indirectly pressures third-parties to end their dealings with Plaintiff will satisfy the third element," so long as that conduct is improper or unjustified. In the instant case, the Defendants may have been within their legal rights to cease dealing with Monette. However, Malandruccolo made the decision to oust Monette from business, as evidenced by his comment to Picarella that he was "going to boot" Monette out of business. Defendants, utilizing deceit and trickery, then duped Monette into allowing one of Defendants' employees to ride with him as he made his daily bread deliveries for the purpose of compiling a list of Monette's customers and their locations. Defendants intended to sell bread to them directly.

After having accomplished this result, Defendants then ceased the sale of their products to Monette and immediately visited his customers. Not only did Defendants seek to establish direct delivery of the International Bakery products previously delivered by Monette, but also pursued direct supply of pita bread and bun products previously supplied by other bakeries to Monette for delivery on his route. All this evidence, in cumulation, suggests conduct beyond the mere cessation of business relations with Monette. The jury could, and did, find that Defendants improperly and unjustifiably interfered with Monette's business relations with his customers.

Viewed another way, the acts of Defendants in fraudulently procuring Monette's customer list were an active step in the Defendants' process of eventually soliciting and acquiring Monette's retail customers. Defendants' treatment of Monette in this case greatly tainted their otherwise rightful process of terminating relations with Monette and establishing direct supply lines to retail customers. If Defendants had simply refused to sell to Monette, there would be no cause of action. *Wilkinson,* 1 N.W.2d at 542. If Defendants had utilized other, proper means besides duplicity to end their relationship with Monette and engage in free enterprise competition, no tort would have been committed. However, "[d]efendants cannot be heard to say that they should not be held liable for the injury caused plaintiff by their unlawful acts merely because they could have caused the same injury by a lawful act." *Id.* at 543. The deceit, combined with use of the fruits of that deceit, i.e., the customer list, to interfere effectively with and end Monette's business, forms the basis of this tort violation.

Alternatively, even though there is no requirement that a plaintiff prove active solicitation of his customers by defendants, sufficient evidence was presented at trial in this case to infer active solicitation. Malandruccolo and Bondy visited the retail customers almost immediately after International Baking ceased supplying Monette with bread products. Bondy testified that the purpose of such visit was to inform the retail customers that they could no longer purchase International Baking products from Monette and that any products formerly purchased from Monette would have to be purchased directly from International Baking. This evidence is similar to evidence construed in *Wilkinson* as active solicitation, in which letters were mailed to farmers essentially stating that, if they wished the creamery to buy their milk, they would have to use the creamery trucks. Given the conduct upheld as tortious in *Wilkinson,* this Court must agree that the district court properly submitted the case to the jury.

The judgment of the district court is AFFIRMED.

WELLFORD, Senior Circuit Judge, dissenting:

The following "facts" are recited verbatim from the amended complaint in this case (footnotes are added by this author):

5. On or about September 30, 1988, Monette paid approximately $28,000 for the purchase of a bread route. The bread route was purchased from Sam Picarella.[1]

. . . . .

7. Monette had full proprietary rights to the bread run. Monette had no contractual relationship with International Baking which would require Monette to purchase bread products from International Baking.

8. Monette had a contractual relationship with his customers who were reselling the bread at retail. Such contractual relationships were well established.[2]

. . . . .

10. On Tuesday, February 21, 1989, Earl and Malandruccolo informed Monette after Monette's bread truck was loaded for delivery, that International Baking was not going to sell any more bread to Monette.

11. On February 21, 1989, Malandruccolo asked whether the route was for sale. Monette replied that he would sell it for $15,000.00. Malandruccolo replied that $15,000.00 was too much money.

12. On Tuesday, February 21, 1989, Malandruccolo and Earl stopped at all of Monette's customers, the names of which Earl had previously written down, and told them that they would be given a reduced price were they to purchase bread from International Baking and that Monette would no longer be delivering their bread. International Baking has begun to service Monette's bread route with its own truck and driver.

Monette testified that due to a family situation he had not made any deliveries on February 18, 1989. This absence admittedly upset defendants who made their dissatisfaction clear. Monette also testified that "a few weeks before [February 21, 1989] he put it in the paper [an advertisement to sell the route] because it was too much on his nerves." Monette therefore operated the route for about four and a half months

before going out of business. He waited to sell the route before giving it up and offered it for sale, unsuccessfully, for $15,-000. It is obvious, therefore, that a jury award for compensatory relief in the amount of $60,000 was grossly excessive and unsupported by the evidence. Without a very substantial remittitur, I would find it an abuse of discretion not to grant defendants a new trial on this account even if it were determined that plaintiff had, in fact, made out a case for damages. *See Bahr v. Miller Bros. Creamery,* 365 Mich. 415, 428, 112 N.W.2d 463, 470 (1963).

I would further conclude that plaintiff has failed to make out a case. The district court did not commit error in granting a directed verdict on the claims of interference with contractual relations and misuse of trade secrets. The remaining claim was "intentional interference with prospective economic advantage," a vague and indefinite kind of tort at best.

We look in this diversity case to Michigan law for a definition and analysis of this unusual cause of action. The act of the defendant in interfering must be intentional, done to accomplish an unlawful purpose, and without legal justification. *See Bahr,* 365 Mich. at 415, 112 N.W.2d at 463; *Wilkinson v. Powe,* 300 Mich. 275, 1 N.W.2d 539 (1942). That defendants deceitfully obtained knowledge of Monette's customers is not enough in my view to carry plaintiff's burden. Plaintiff had other suppliers on his route and there is no showing that he could not have obtained other sources than AM-7-7 Baking Co. if he desired to maintain his route. There is no showing that defendants induced customers away from Monette; they simply exercised a right to discontinue business with an independent routeman they deemed unsatisfactory.

The cases relied upon by plaintiff involve the taking away of a complete source from the complaining party with an unlawful purpose. Monette had other sources and

---

1. Picarella had purchased the route six and a half years previously for $30,000.

2. Monette had no written contract assuring any quantity for future delivery.

was desirous anyway of selling his route if he could obtain a satisfactory price.

Accordingly, I would reverse, or in the alternative, grant a new trial or a remittitur on the amount of damages.