Terry P. POWERS, next friend of
Hillary Ann Powers; et al.,
Plaintiffs–Appellants,

v.

BAYLINER MARINE CORPORATION,
a Delaware Corporation,
Defendant–Appellee.

No. 94–2035.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 28, 1995.

Decided May 20, 1996.

Brion J. Brooks, William F. Mills, Gruel, Mills, Nims & Plyman, Grand Rapids, MI, for John John Muller.

William M. Bremer, Bremer, Wade, Nelson, Lohr & Corey, Grand Rapids, MI, George J. Koelzer (argued and briefed), Lane, Powell, Spears & Lubersky, Los Angeles, CA, for Bayliner Marine Corp.

Before: MARTIN and JONES, Circuit Judges and COHN, District Judge.*

COHN, D.J., delivered the opinion of the court, in which MARTIN, J., joined. JONES, J. (pp. 800–806), delivered a separate dissenting opinion.

COHN, District Judge.

This is an appeal from a products liability judgment following a jury verdict, both in favor of defendant-appellee, Bayliner Marine Corporation (Bayliner). Plaintiffs-appellants (plaintiffs) are the representatives of persons either injured or killed when a sailboat manufactured by Bayliner (the Buccaneer 180) flooded and overturned on Lake Michigan in August of 1991. A jury found that the Buccaneer 180 was not defective and that Bayliner was not negligent. Plaintiffs' motions for judgment as a matter of law and a new trial were denied. On appeal, plaintiffs argue that (1) the Buccaneer 180 was proven defective as a matter of law; (2) Bayliner was shown to be guilty of negligence as a matter of law; (3) the trial court erred in allowing the jury to reject testimony, whether contested or not; (4) the trial court erred in relying on irrelevant and immaterial evidence to justify the jury's verdict; and (5) the jury's verdict was against the great weight of the evidence. Bayliner responds that the trial court committed no legal error or abuse of discretion in denying plaintiffs' motions. For the reasons which follow, the denial of plaintiffs' motions for judgment as a matter of law and for a new trial will be affirmed.

I.

A.

On August 31, 1991, three adults and four children took a seventeen-foot Bayliner Buc-

Hal O. Carroll, Vandeveer & Garzia, Detroit, MI, for Terry P. Powers.

William J. Heaphy (argued and briefed), Vandeveer & Garzia, Holland, MI, for Hillary Ann Powers, Nancy Diane Powers, Thomas E. Lane, and Judith Reed.

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

caneer 180 sailboat out onto Lake Michigan for approximately five hours. At around 7:30 p.m., the Buccaneer 180 flooded and overturned as it was returning to land. Only one adult and one child survived.

A half mile away from the pier, as the Buccaneer 180 returned to shore, the boat's owner, Michael DeWilde (DeWilde) tried to start the outboard engine but it stalled. The surviving child, who had been sleeping in the cuddy cabin, woke up at the sound of the motor and found herself waist-deep in water.

Another adult yelled that the boat was taking on water, bailed two pailfuls, realized the water was coming in too fast, and told the children to get out of the boat. As the children, who were in the cuddy cabin, attempted to climb through its opening, the stern sunk to the water line and water began to pour in. The Buccaneer 180 quickly flooded and overturned. DeWilde estimates that the above events took approximately twenty seconds.

Hillary Powers, eight years old at the time of the accident, was thrown into the lake when the Buccaneer 180 overturned and was rescued the following morning after sixteen hours afloat.

Joey Bordeaux, Hillary's brother, was four. He was trapped in the cuddy cabin after the Buccaneer 180 overturned but then was brought up to the surface and placed on the top of the capsized Buccaneer 180. After a few hours of being repeatedly washed from the boat, he died of exposure.

Timothy and Steven Knapp, aged ten and eight, drowned hours after the Buccaneer 180 overturned.

Nancy Diane Powers, twenty-six, left the overturned Buccaneer 180 after several hours in the water and drowned during the night. Her remains were found several months later.

Tom Muller, twenty-three, tried to swim to shore for help, but did not make it. His body was found several weeks later.

DeWilde survived the night and was rescued the next morning.

### B.

Bayliner did not design the Buccaneer 180, but bought the plans from another company. DeWilde's Buccaneer 180 was built in January of 1979. The centerboard keel on the Buccaneer 180 is designed to be retractable into the centerboard trunk, much like the blade of a pocket-knife folding into its handle. This design feature allows the Buccaneer 180 to be more easily transported out of the water. A rope travels from the centerboard keel underneath the Buccaneer 180, through a centerboard trunk hole, to a location in the cabin where a person can raise or lower the centerboard keel. Any water that comes in to the Buccaneer 180 through the centerboard trunk hole goes to the bilge area, generally not visible to occupants. The bilge can be directly drained of water when the Buccaneer 180 is out of the water or it can be bailed or pumped out through the cuddy cabin. The centerboard trunk hole is 12 inches from the bottom of the Buccaneer 180, which places the hole four inches above the waterline when the boat is empty. With a weight on board of 800 to 900 pounds [1], the centerboard trunk hole is $1\frac{7}{8}$ inches above the water line. Neither party asserts any utility to the specific location of the centerboard trunk hole.

At a point after the Buccaneer 180 was placed in the marketplace, Bayliner recognized that the position of the centerboard trunk hole was a problem and conducted a retrofit campaign [2] to raise the Buccaneer 180's centerboard trunk hole by a dealer-installed device. There is no evidence, however, that any unmodified Buccaneer 180 had ever capsized as a result of the centerboard trunk hole design. Bayliner notified the owners known to it of the change, and sent letters to its dealers, asking them to contact purchasers in order to install the modifica-

---

1. The weight at the time of the accident, as computed by the Ottawa County Sheriff's Department, was 845 pounds.

2. A "retrofit" and a "recall" are two different methods of repairing a product. A "recall" asks for the return of the product to the manufacturer while a "retrofit" may entail merely a letter to users or a distributed corrective device.

tion. DeWilde purchased his Buccaneer 180 from a family, who in turn purchased it used. The family never received notice of the recall and that particular Buccaneer 180 was not fitted with the corrective device.

### C.

### 1.

Plaintiffs sued Bayliner for wrongful death and personal injury in United States District Court for the Western District of Michigan in July of 1994. As the trial court instructed the jury, "plaintiffs claim that defendant Bayliner, one, manufactured and distributed a defective sailboat; and, two, was negligent in failing to warn of the sailboat's dangers and in failing to conduct a reasonable recall or retrofit campaign." More particularly, plaintiffs claimed that the centerboard trunk hole was a product defect and a proximate cause of the accident, and that Bayliner was therefore strictly liable under maritime law. Plaintiffs presented evidence through lay witnesses, expert testimony, and a videotaped test that the centerboard trunk hole allowed water to enter the subflooring of the Buccaneer 180, gradually filling the bilge and lowering the boat in the water.

Plaintiffs offered the testimony of Eric Sponberg (Sponberg) as an expert in naval architecture. Sponberg testified that the more weight there was on the Buccaneer 180, the shorter the distance between the lower lip of the boat's centerboard trunk hole and the water line. Sponberg also testified that the closer the centerboard trunk hole was to the water line, the more water entered the bilge area of the Buccaneer 180, thus adding to the weight and decreasing the boat's stability. Sponberg also described other boats he had examined, none of which had "a configuration that provides a hole located a foot from the bottom of the boat in an enclosed compartment that is not visible from the cockpit nor unbailable when the boat is under way." Sponberg concluded his direct testimony by stating that "[t]his is a significantly dangerous boat."

Plaintiffs also presented testimony from the following witnesses: Adolf Wolf (Wolf) testified about DeWilde's sailing of the Buccaneer 180 on the night of the accident; G. Ronald Wright (Wright) and Peter Manting (Manting), both ex-owners of Buccaneer 180s, testified that the Buccaneer 180 took on water in normal sailing conditions; and E. Patrick McGuire (McGuire), a products safety consultant, testified that Bayliner's retrofit campaign was unacceptable.

### 2.

Bayliner countered that plaintiffs' expert and tests were not credible and that there were alternate causes for the Buccaneer 180's capsize. Bayliner offered evidence that the adults drank beer and smoked marijuana during the course of the sailing trip, the Buccaneer 180 was overloaded with seven people and was low on the water as it left shore, the weather during the sail was threatening, there were an insufficient number of life preservers on board, there was no radio or flares on board, and early warnings of water coming on board were ignored. Bayliner presented testimony from a small-boat sailor, Augusto Villalon (Villalon), who criticized DeWilde's sailing and Sponberg's evidence, and from a Bayliner engineer, Clark Scarboro (Scarboro), who testified as to the design of the Buccaneer 180 and stated that no Buccaneer 180 had ever overturned because of flooding. Bayliner also cross-examined plaintiffs' witnesses as to their credibility and substantive testimony.

### 3.

At the close of all proofs, both parties moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a). The trial court denied the motion and submitted the case to the jury. Neither party objected to the proposed jury instructions, and the trial court instructed the jury as follows:

### OPINION EVIDENCE— EXPERT WITNESS

The rules of evidence ordinarily do not permit witnesses to testify as to opinions or conclusions. An exception to this rule exists as to those whom we call "expert witnesses." Witnesses who, by education and experience, have become expert in some art, science, profession, or calling,

may state their opinions as to relevant and material matters, in which they profess to be expert and may also state their reasons for the opinion.

You should consider each expert opinion received in evidence in this case and give it such weight as you may think it deserves. If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound, or if you feel that it is outweighed by other evidence, you may disregard the opinion entirely.

. . . .

## SINGLE WITNESS

The testimony of a single witness which produces in your minds belief in the likelihood of truth is sufficient for the proof of any fact and would justify a verdict in accordance with such testimony even though a number of witnesses may have testified to the contrary if, after consideration of all the evidence in the case, you hold greater belief in the accuracy and reliability of the one witness.

. . . .

## CREDIBILITY OF WITNESSES— DISCREPANCIES IN TESTIMONY

You, as jurors, are the sole judges of the credibility of the witnesses and the weight their testimony deserves. You may be guided by the appearance and conduct of the witness or by the manner in which the witness testifies or by the character of the testimony given or by the evidence contrary to the testimony given.

You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to show whether a witness is worthy of belief. Consider each witness's intelligence, motive, and state of mind and demeanor or manner while on the stand. Consider the witness's ability to observe the matters as to which he or she has testified and whether he or she impresses you as having an accurate recollection of these matters.

Consider also any relation each witness may bear to either side of the case; the manner in which each witness might be affected by the verdict; and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness or between the testimony of different witnesses may or may not cause the jury to discredit such testimony.... [Y]ou will give the testimony of each witness such weight, if any, as you may think it deserves. You may in short, accept or reject the testimony of any witness in whole or in part.

. . . .

## IMPEACHMENT—INCONSISTENT STATEMENTS OR CONDUCT

A witness may be discredited or impeached by contradictory evidence.... If you believe any witness has been impeached and thus discredited, it is your exclusive province to give the testimony of that witness such credibility, if any, as you may think it deserves.

. . . .

## NOT REQUIRED TO ACCEPT UNCONTRADICTED TESTIMONY

You are not required to accept testimony even though the testimony is uncontradicted and the witness is not impeached. You may decide, because of the witness's bearing and demeanor or because of the inherent improbability of his or her testimony or for other reasons you find sufficient, that such testimony is not worthy of belief.

## PLAINTIFFS' CLAIMS

The plaintiffs must establish [four] essential elements in order to recover on their claim that the Bayliner Buccaneer 180 was defectively designed or manufactured as follows.

First, that the boat was in a defective condition at the time it left the possession of the manufacturer.

Second, that the boat was unreasonably dangerous at the time it left the possession of the manufacturer.

Third, that the defective condition was a proximate cause of the plaintiffs' injuries.

And fourth, that the boat was expected to and did reach the consumer without substantial change in its condition and remained in the possession of the consumer without substantial change in its condition.

. . . .

### "DEFECTIVE CONDITION" DEFINED

A product is in a defective condition unreasonably dangerous to the user when it has a propensity for causing physical harm beyond that which would be contemplated by the ordinary user or consumer with the ordinary knowledge common to the foreseeable class of users as to its characteristics.... [Y]ou must balance the utility of design against the magnitude of the risk.

. . . .

You will find the Bayliner Buccaneer 180 sailboat to be defective only if it was unreasonably dangerous for its normal use. The normal use of a product includes all reasonably foreseeable uses, including foreseeable misuse.

. . . .

### UNINTENTIONAL TORT—
### NEGLIGENCE—
### DEFINED

. . . .

Negligence is the doing of some act which a reasonably prudent person would not do or the failure to do something which a reasonably prudent person would do when prompted by considerations which ordinarily regulates the conduct of human affairs. It is, in other words, the failure to use ordinary care under the circumstances....

. . . .

### WARNING

Plaintiffs[ ] claim that Bayliner failed to warn that the Buccaneer 180 may take on water through the centerboard trunk and failed to warn that the boat's safe weight capacity was less than its apparent capacity. Plaintiffs claim that these were dangers which defendant knew of, or should have known of, and which defendant had no reason to reasonably believe that its user would know of.

### RECALL

Plaintiffs claim that the defendant was negligent in its conduct of the recall or retrofit of the Buccaneer 180....

**4.**

The trial court asked the jury for a special verdict, pursuant to Fed.R.Civ.P. 49. The first two questions submitted to the jury were:

1. Did the Defendant Bayliner Marine Corporation manufacture a defective product? ___ Yes ___ No.
2. Was the Defendant Bayliner negligent in one or more of the ways claimed by Plaintiffs? ___ Yes ___ No.

The jury answered both of these questions "no," and therefore did not answer the remaining questions, which were concerned with proximate cause, comparative negligence and damages. The trial court entered judgment in favor of Bayliner.

**5.**

Plaintiffs moved for either post trial judgment as a matter of law, Fed.R.Civ.P. 50(b) (Rule 50(b)), or a new trial under Fed. R.Civ.P. 59(a) (Rule 59(a)). Plaintiffs' motions centered on the argument that Bayliner did not offer any evidence to rebut plaintiffs' evidence that the Buccaneer 180 was defectively designed. Bayliner replied that plaintiffs had the burden of proof, Bayliner had raised a question as to the credibility of plaintiffs' expert witness through cross-examination and had offered contrary evidence, and the jury was free to reject plaintiffs' evidence even if it was uncontradicted.

The trial court ruled that judgment as a matter of law in plaintiffs' favor was not required:

> [a]lthough defendant Bayliner did not offer expert testimony to rebut plaintiffs' naval architect, Bayliner offered proof that the boat was sailed in unreasonably rough water and high winds, for a boat of this size, for an extended period of time by individuals whose judgment was impaired by alcohol and/or marijuana, and that the owner of the boat ignored warnings by a minor passenger that the boat had water in the bilge. In this Court's judgment, not only was the jury free to disregard the testimony of plaintiffs' expert, the jury was also free to reasonably conclude that the accumulation of water in the boat was the result, not of any design or manufacturing defect, but of negligent operation of the boat.

Further, since plaintiffs bore the burden of proof, Bayliner "had no obligation to present any evidence whatsoever." As to plaintiffs' motion for a new trial, the trial court said that "[p]laintiffs had the burden of proof by a preponderance of evidence. The jury's determination that plaintiffs did not carry this burden cannot be said to be seriously erroneous or a miscarriage of justice."

### 6.

On appeal, plaintiffs ask that we reverse the trial court's rulings, find for plaintiffs on the special verdicts, and remand for trial on the remaining issues; or in the alternative, that we reverse the trial court's rulings and order a new trial on liability and damages.

### II.

### A.

A motion for judgment as a matter of law requires the trial court to determine "whether there was sufficient evidence presented to raise a material issue of fact for the jury." *Monette v. AM–7–7 Baking Co.,* 929 F.2d 276, 280 (6th Cir.1991). "The standard remains the same when the trial court's decision is reviewed on appeal." *Id.* Evidence is sufficient to submit to a jury unless, "when viewed in the light of those inferences most favorable to the nonmovant, there is either a complete absence of proof on the issues or no controverted issues of fact upon which reasonable persons could differ." *Id.* The court must be careful, however: "the court should neither weigh the evidence, evaluate the credibility of the witnesses, nor substitute its judgment for that of the jury." *Wayne v. Village of Sebring,* 36 F.3d 517, 525 (6th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 2000, 131 L.Ed.2d 1001 (1995). "Only when it is clear that reasonable people could come to but one conclusion from the evidence should a court grant a motion for directed verdict." *Id.*

### B.

A trial court should deny a motion for a new trial "if the verdict is one that reasonably could be reached, regardless of whether the trial judge might have reached a different conclusion were he the trier of fact." *Id.* The trial court may be reversed in its denial of a motion for new trial "only on the showing of an abuse of discretion." *Cathey v. Johns–Manville Sales Corp.,* 776 F.2d 1565, 1573 (6th Cir.1985), *cert. denied,* 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986). "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Monette,* 929 F.2d at 280.

### III.

Plaintiffs present essentially two arguments on appeal. First, they argue that it was improper for either the jury or the trial court to rely on evidence not relating to the design of the Buccaneer 180 in answering or justifying the special verdict questions about defect or negligence. Second, they argue that the trial court erred on the merits by denying plaintiffs' motions for judgment as a matter of law and for a new trial.

### A.

Plaintiffs argue that the trial court should have considered only the evidence regarding the design of the Buccaneer 180 in reviewing plaintiffs' motions for judgment as a matter of law and for a new trial, and not

the evidence concerning their actions on the boat. According to plaintiffs, evidence of their own misconduct may eventually go to causation or comparative negligence, questions not considered by the jury, but such evidence is irrelevant to the initial determinations of defect and negligence.

The evidence relating to plaintiffs' alleged misconduct was not used by the trial court to show comparative fault or proximate cause, but as an alternative explanation for how the water entered the Buccaneer 180. As the trial court said, "the jury was ... free to reasonably conclude that the accumulation of water in the boat was the result, not of any design or manufacturing defect, but of negligent operation of the boat." There is no error in the trial court's reference to the evidence of plaintiffs' actions in sailing the boat.

## B.

### 1.

■ Turning now to evaluate the answers to the special verdict questions in light of the evidence as a whole, such review of a jury's verdict is not to be taken lightly. In reviewing a trial court's denial of a Rule 50(b) motion as a matter of law an appellate court must make reasonable inferences in the non-movant's favor and ask whether "it is clear that reasonable people could come to but one conclusion from the evidence." *Wayne*, 36 F.3d at 525. The trial court's denial of a motion for a new trial is reviewed for abuse of discretion. The trial court instructed the jury that it should "find ... [the Buccaneer 180] to be defective only if it was unreasonably dangerous for its 'normal' use. The normal use of a product includes all reasonably foreseeable uses, including foreseeable misuse." We must therefore ask whether, making reasonable inferences in Bayliner's favor, reasonable people could only come to the conclusion that the Buccaneer 180 was unreasonably dangerous for its normal use.

### 2.

■ Plaintiffs argue that the jury's rejection of Sponberg's testimony regarding the Buccaneer 180 design merits judgment as a matter of law or a new trial. However, as the trial court stated, "[p]laintiffs' argument ignores the proper duty of the jury to accept or reject testimony in whole or in part, a duty accurately set forth in the final jury instructions, to which plaintiffs did not object." The trial court gave the following instructions regarding the acceptance or rejection of testimony:

> You should consider each expert opinion received in evidence ... and give it such weight as you may think it deserves.... [Y]ou may disregard the opinion entirely.
>
> ....
>
> You, as jurors, are the sole judges of the credibility of the witnesses and the weight their testimony deserves.... Consider ... the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.... [Y]ou will give the testimony of each witness such weight, if any, as you may think it deserves. You may in short, accept or reject the testimony of any witness in whole or in part.
>
> ....
>
> If you believe any witness has been impeached and thus discredited, it is your exclusive province to give the testimony of that witness such credibility, if any, as you may think it deserves.
>
> ....
>
> You are not required to accept testimony even though the testimony is uncontradicted and the witness is not impeached.

■ Nor did the trial court err in so instructing the jury. "There are many circumstances in which testimony need not be accepted even though formally uncontradicted," *Sheppard v. Maxwell*, 346 F.2d 707, 726 (6th Cir.1965), *rev'd on other grounds*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). "[T]he jury is instructed that it is completely free to accept or reject an expert's testimony, and to evaluate the weight given such testimony in light of the reasons the expert supplies for his opinion." *United States v. 0.161 Acres of Land in Birming-*

*ham, Ala.*, 837 F.2d 1036, 1040–41 (11th Cir. 1988). As the Supreme Court has stated:

> [u]ndoubtedly, as a general rule, positive testimony as to a particular fact, uncontradicted by any one, should control the decision of the court; but that rule admits of many exceptions. There may be such an inherent improbability in the statements of a witness as to induce the court or jury to disregard his evidence, even in the absence of any direct conflicting testimony. *Quock Ting v. United States*, 140 U.S. 417, 420, 11 S.Ct. 733, 734, 35 L.Ed. 501 (1891).[3]

Thus, the jury could have rejected Sponberg's testimony even if uncontradicted.

### 3.

Sponberg and plaintiffs' other witnesses were not uncontradicted, however. Cross examination of Sponberg revealed that he did not know when the boats he compared to the Buccaneer 180 were built[4]; the comparison boats were not similar to the Buccaneer 180 in certain details; he did not personally inspect some of the comparison boats about which he testified; he did not note the model of at least one comparison boat; he had never designed, built, nor testified about a centerboard boat before; he did not inspect any new centerboard boats; he did not inquire as to whether any other Buccaneer 180 had ever capsized and he would have been surprised "if there were not other instances"; the fact that no Buccaneer 180 had ever capsized because of water entering the centerboard trunk hole did not change his opinion that the Buccaneer 180 was a very dangerous boat because it was his expert opinion that all centerboard boats are dangerous, regardless of whether or where they have a centerboard trunk hole; he initially denied that it was his opinion that all centerboard boats are dangerous[5]; the most prominent textbook on the design of small sailboats does not cover the design of centerboard trunks[6]; he did not know if any other textbooks covered the design of centerboard sailboats and he did not make any effort to look for any; his trial testimony that he "consider[ed] [him]self an expert in sailing the Buccaneer 180" contradicted his deposition testimony that "[f]or that particular boat, no, I'm not an expert in sailing"; it is prudent and

---

**3.** *See also, Sartor v. Arkansas Gas Corp.*, 321 U.S. 620, 627–28, 64 S.Ct. 724, 729, 88 L.Ed. 967 (1944) ("it is for the jury to decide whether any, and if any what, weight is to be given to the testimony"); *Dawsey v. Olin Corp.*, 782 F.2d 1254, 1263 (5th Cir.1986) ("[t]he jury may ... decide what weight to give to the [expert's] testimony"); *Pollard v. Metropolitan Life Ins. Co.*, 598 F.2d 1284, 1288 (3rd Cir.), *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 171 (1979) (jury "should ... give [expert opinions] such weight as [jury] thinks it deserves"); *United States v. Jackson*, 425 F.2d 574, 577 (D.C.Cir.1970) ("the weight, if any, to be given ... expert testimony was exclusively for the jury's determination"); *United States v. Schwartz*, 398 F.2d 464, 469 (7th Cir.1968), *cert. denied*, 393 U.S. 1062, 89 S.Ct. 714, 21 L.Ed.2d 705 (1969) ("jury for a variety of reasons could disbelieve an uncontradicted witness"); 3 Devitt, Blackmar & Wolff, Federal Jury Practice and Instructions, §§ 72.08, 73.01.

**4.** Q. Whether any of those boats that you talked about this afternoon and their various centerboard designs were designed or built prior to January 1979 [the date DeWilde's Buccaneer 180 was built]. Do you have any evidence to that effect?
A. No.
. . . .
Q. Sir, just tell me yes or no. You never made that inquiry in each case, isn't that true?
A. That's true.

**5.** Q. Okay. Will you agree, sir, that in your expert opinion all centerboard boats are dangerous?

A. No, I won't agree with that.

**6.** Q. Do you know if there are any textbooks in the field of boat design or naval architecture dealing specifically with the design of small sailboats typified by the Buccaneer 180?

A. Yes, there are books.
Q. And could you give me the names of those books, sir?
A. Well, the one most prominent one is *Skene's Elements of Yacht Design*.
. . . .
Q. Can you cite us to any page or citation in that book which deals specifically with the design of a centerboard trunk?
. . . .
Q. The answer is no, I can't cite you to a page, is that correct?
A. That's correct.
. . . .
Q. Now, is the reason you can't cite us to a page is because there is nothing in Skene's book on that specific point? Can we agree on that?
A. Yes.

simple common sense to check the weather before sailing on a large body of water; the Buccaneer 180 did not deviate from any standard of naval architecture [7]; boats like the Buccaneer 180 are not designed to be watertight [8]; and reasonable minds could differ as to the danger posed by the Buccaneer 180 [9].

Plaintiffs' other witnesses were also attacked on cross examination. Wolf testified on direct examination that the weather on the day of the accident did not pose a safety risk:

Q. Now, the weather conditions that you have recited or at least the wind conditions that you recited from the Muskegon report, would you believe that they would be suitable conditions for Buccaneer 180s, for boats of that general size and configuration, to sail near the shore of Lake Michigan?

A. Yes, they would be.

On cross examination, Wolf testified that he would not have taken the Buccaneer 180 out under the weather conditions of the day of the accident:

Q. Would you have taken a Buccaneer 180 out on Lake Michigan with seven people on board in 15–mile-an-hour winds on three-foot waves and growing on the afternoon of August 31, 1991? Just tell me yes or no.

A. I would not.

Q. Would you have done it besides having had some beer to drink and also smoking marijuana? Would you just tell me yes or no?

. . . .

Q. So your answer is no, is that correct?

A. Correct.

Wright and Manting, past owners of the Buccaneer 180, both testified that the Buccaneer 180 could not handle the use it was put

to the day of the accident. Wright testified on cross examination that the Buccaneer 180 should not have been taken out on Lake Michigan or with seven people and that DeWilde should have checked the weather before going out. Manting testified that the Buccaneer 180 was not designed for four foot waves or to carry seven people. McGuire, plaintiffs' safety notification expert, testified on direct examination that the notification letters Bayliner sent to owners and dealers about the centerboard trunk hole problem was "defective". On cross examination, the following colloquy occurred:

Q. Do you know if any other materials, labels, tags, or anything of that nature were sent with either of these two letters when they were sent out?

A. No.

. . . .

Q. And would your testimony here today change in any respect if it were the case that other materials were sent out when either or both Exhibit 1 and 2 were mailed?

A. Yes, if the materials impinged on that area of testimony.

Q. I see. And you don't know.

A. No, I don't.

4.

In addition to directly attacking the credibility of plaintiffs' witnesses, Bayliner presented testimony of its own. Villalon criticized Sponberg's test, stating that it did not accurately reflect the conditions the day of the accident: the test did not utilize the Buccaneer 180's jib, its forward sail; the test used dead weight instead of people; and the test was conducted on an inland lake rather than on Lake Michigan. Villalon also testified as to why those differences might be

7. Q. . . . . You are saying that neither the design nor the manufacture of the Buccaneer 180 deviated from any standard so far as you know as an expert witness in the field, yes?
   A. Yes.

8. Q. Mr. Sponberg, will you agree with me that a centerboard trunk on a sailboat such as the ones we are talking about in this case are not designed to be water tight? Would you say yes to that?

A. Yes.

9. Q. Sir, could reasonable minds differ as to the design configuration—the dangerousness of this design configuration as you have testified to?
   A. Oh, yes.
   . . . .
   A. Yes, minds can differ about the degree of danger.

important. Villalon gave his opinion as to the reasons for the accident: the weather report had not been checked; insufficient safety equipment; the use of alcohol and drugs; the failure to notice the Buccaneer 180's sluggish responses; and DeWilde had taken the boat too far out. Villalon concluded that "[a]ll these sailing dinghies take water one way or another, all of them," and that "the water must be removed and it is your responsibility to remove the water." On cross examination, Villalon testified as follows:

Q. And as I understand, it's your contention that Mr. DeWilde should have been aware that a mistake had been made with his boat and that water was accumulating in the bilge area, is that correct?

A. Yes.

Scarboro, a Bayliner engineer, testified without contradiction that there had never been a Buccaneer 180 that had capsized by reason of water coming through the centerboard trunk. Further, Bayliner "didn't feel it was a significant safety issue," in part because of "the nature of the boat, which is really a fairly small boat, which could be tipped over fairly easily and was really only suitable for use on protected waters or areas fairly close to shore." Finally, Scarboro testified that there were many ways that DeWilde could have emptied the water from the Buccaneer 180.

### 5.

Making all reasonable inferences in Bayliner's favor, the evidence on product defect offered the jury was that the Buccaneer 180 was heavily loaded and was operated in weather that was too rough for a boat of its size and structure. There was no evidence that any boats with Bayliner's centerboard trunk hole design had ever capsized. And most importantly, plaintiffs' own expert witness testified that the design of the Buccaneer 180 did not violate any safety standards and that reasonable minds could differ as to the danger of the design.

Evidence was presented which would allow a reasonable person to come to the conclusion that the Buccaneer 180 was not unreasonably dangerous for its normal use. As

the jury was justified in finding that the Buccaneer 180 design was not defective, it was also justified in finding that Bayliner was not negligent in its handling of the Buccaneer 180 or its retrofit campaign.

There was sufficient evidence to submit the case to the jury, and "[g]iven the infirmities in the only expert testimony presented by plaintiffs, there was no abuse of discretion in denying a new trial." *Fernandez v. Corporacion Insular De Seguros,* 79 F.3d 207, 212 (1st Cir.1996).

### IV.

For the reasons stated above, the order denying plaintiffs' motions for judgment as a matter of law and for a new trial is AFFIRMED.

NATHANIEL R. JONES, Circuit Judge, dissenting.

Under the circumstances in this case, I believe the Bayliner Buccaneer 180 was defective and the district court's denial of the motion for a new trial on the issue of negligence was based on an errant analysis that constituted a clear error of judgment. We should reverse the denial of Plaintiffs' motions for judgment as a matter of law and new trial and find for the Plaintiffs on special verdict question 1, while remanding the case for trial on special verdict question 2 and the remaining issues not reached by the jury. Accordingly, I dissent.

I agree with my colleagues that this court applies the same standard in reviewing decisions on motions for judgment as a matter of law as the district court applies in deciding these motions. *See Monette v. AM–7–7 Baking Co.,* 929 F.2d 276, 280 (6th Cir.1991). In the case at bar the district court accurately explained that:

A district court has authority to grant a judgment notwithstanding the verdict to protect against completely unjust and unsupported results. But this authority is limited by a strict standard of review. It is not enough that the district court disagrees with the verdict. Rather, a judgment notwithstanding the verdict "may be granted only if, viewing the admissible evi-

dence most favorable to the party opposing the motion, a reasonable trier of fact could draw only one conclusion." *Hill v. Spiegel, Inc.*, 708 F.2d 233, 237 (6th Cir.1983) (further citations omitted).

J.A. at 40. This court has defined the inquiry to be made on Rule 50 motions as follows:

> [T]he district court must determine whether there was sufficient evidence presented to raise a material issue of fact for the jury. As applied in this context, "sufficient evidence" will be found unless, when viewed in the light of those inferences most favorable to the non movant, there is either a complete absence of proof on the issues or no controverted issue of fact upon which a reasonable person could differ.

*Monette*, 929 F.2d at 280 (citations omitted).

I also recognize that the disposition of a motion for a new trial is reviewed for abuse of discretion; the trial court should deny the motion if the verdict is one that reasonably could be reached, regardless of whether the trial judge might have reached a different conclusion were he the trier of fact. *United States v. L.E. Cooke Co.*, 991 F.2d 336, 343 (6th Cir.1993). Again the district court correctly notes:

> The court has discretion to grant a new trial if the verdict appears to be against the great weight of the evidence. *Hawley, supra*, 958 F.2d at 725. The Court must weigh the evidence, but should not set aside a jury verdict merely because the jury could have drawn different conclusions or because other results are "more reasonable." *Id.* at 742; *Portage II v. Bryant Petroleum Corp.*, 899 F.2d 1514, 1523 (6th Cir.1990). The jury verdict should be accepted if it is one which could reasonably have been reached. *Portage II, supra* 899 F.2d at 1523–24.

J.A. at 43–4. A district court can be said to have abused its discretion if this court has "a definite and firm conviction that the trial court committed a clear error in judgment." *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790–91 (6th Cir.1989).

Applying these standards of review and understanding the seriousness of granting a judgment as a matter of law or new trail, I find that reversal is appropriate in this case.

**I**

With respect to Plaintiffs' allegation of product defect, the jury was posed the following question: "Did the Defendant, Bayliner Marine Corporation, manufacture a defective product." Along with that question, the jury was given instructions on Plaintiffs' claim. The instructions, consistent with Michigan and maritime law, read:

### "DEFECTIVE CONDITION" DEFINED

A product is in a defective condition unreasonably dangerous to the user when it has a propensity for causing physical harm beyond that which would be contemplated by the ordinary user or consumer, with the ordinary knowledge common to the foreseeable class of users as to its characteristics. A product is not defective or unreasonably dangerous merely because it is possible to be injured while using it.

### DESIGN DEFECT

In determining whether the Bayliner Buccaneer 180 sailboat is defective because of its design, you must balance the utility of design against the magnitude of the risk.

You can find the defendant liable only if it, knowing the risk, did not act reasonably in putting the product on the market. To determine whether the defendant acted unreasonably in putting the boat on the market, you must consider and balance the factors which make up the design process, including the following:

1. The usefulness and desirability of the product;

2. The availability of other and safer products to meet the same need;

3. The likelihood of injury and its probable seriousness;

4. The obviousness of the danger;

5. The common knowledge and normal public expectation of the danger (particularly for established products);

6. The avoidability of injury by care in use of the product (including the effect of instructions or warnings); and

7. The ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive.

### "NORMAL USE"

You will find the Bayliner Buccaneer 180 Sailboat to be defective only if it was unreasonably dangerous for its "normal" use. The normal use of a product includes all reasonable and foreseeable uses, including foreseeable misuse.

J.A. at 214–13.

Given the special verdict question posed to the jury, and given the unchallenged instructions used to answer that question, I do not believe the evidence viewed in a light most favorable to the Defendant was sufficient to support the jury's verdict. In fact, the only reasonable conclusion is that the Buccaneer 180 was unreasonably dangerous for its normal use and there appears to be no genuine issue of material fact on that point. On the issue of design defect, the jury was mistaken as matter of law and the court should have awarded a judgment for the Plaintiffs notwithstanding the jury's verdict.

I reach my conclusion by reviewing the Plaintiffs' evidence related to defect. The Plaintiffs presented expert and opinion testimony that indicated the following. The Buccaneer 180 has an eight square inch hole cut into the centerboard trunk of its hull. This hole, approximately twelve and one-quarter inches above the boat's bottom, four inches above the water line when the boat is empty, one and seven-eighths inches above the water line when the boat has 800–900 pounds on board, cannot be seen from any point outside or inside the craft. As a natural phenomenon, when the boat is at sail, water surges up into the centerboard trunk. Water entering through the centerboard trunk hole flows into an enclosed subfloor bilge chamber, which is not visible from the cockpit of the craft. There is no self bailing mechanism in the chamber. Tests demonstrated that intake of water through the centerboard trunk is exponentially progressive, (with or without

weight beyond stated capacity) lowering the centerboard trunk hole to the waterline, eventually causing down flood. None of the thirteen competitor centerboard boats examined by Sponberg had holes similar to Bayliner's, and those with openings had them either in full view of the cockpit or were equipped with self bailing mechanisms.

Bayliner provided no expert or other testimony to show that the boat did not take on water or that the design, which did not allow observation of the accumulation of the water or permit safe removal while at sail, had a utility, which when balanced against the risks, was warranted. Further, when Bayliner discovered the "problem" with the boat, it conducted a recall/retrofit, thereby acknowledging that there was a concern. The majority's focus on the cross-examination of Sponberg, highlighting weaknesses in his testimony, does not challenge the certainty that the Buccaneer 180 would take on immoderate amounts of water, which could not be observed, thereby creating an unreasonable danger. Further, the comments of Wolf, Wright and Manting on cross-examination focus on the use of the boat the day of the accident, not the alleged defect.

Bayliner suggests that the evidence it presented regarding its "theory of why the boat took on water: overloading the boat; choosing to sail in threatening weather and five-foot seas; sailing six or seven miles offshore, in an offshore wind, which is stronger and causes higher waves offshore," rebutted Plaintiffs evidence of defect. Bayliner's Br. at 20–1. The majority seems to adopt this line of analysis. To the contrary, I believe that this evidence is not evidence of "why the boat took on water;" it merely explains the factual scenario which caused *this* boat to sink more quickly. The Plaintiffs' experts and sailing tests demonstrated that the boat would "take on water" absent these specific facts. The majority points to the testimony of Villalon as criticizing Sponberg's tests. Villalon, however, was not an expert in this area and offered no contradictory tests of his own. Further, his "reasons" for the accident relate to the conditions and activities that day and not to the boat's condition when it left the factory.

Defendant also hints that the evidence it presented regarding the actions of the pas-

sengers on board (drinking alcohol and smoking marijuana) as well as the sailing conditions relate to design defect in that they show an unforeseeable use. Although foreseeable use is part of the equation in determining defect, the appropriate query is the foreseeable "normal" use (including misuse) by an *ordinary, foreseeable* user. A product is defective, or not, when it leaves a manufacturer's hands, irrespective of the ultimate use to which it is put. *See generally* Restatement (Second) Torts § 402A. I believe the majority has erred in allowing these facts to weigh in their decision on the issue of defect. While indeed they are related to ultimate liability, and may preclude the Plaintiffs from recovery, they are not dispositive on the issue of whether the Buccaneer 180 is defective.

I maintain that foreseeable use can not be defined by what the user did in the case before the court. Certainly, if absent the user's misuse the product would not cause uncontemplated injury, then the product is not defective merely because an injury occurred. If, however, as in this case, the product had a propensity for causing uncontemplated harm in other foreseeable use or misuse circumstances, then it is *per se* defective, and the misuse by the party in the case before the court should be considered in determining proximate cause of the injury and comparative negligence of the parties, not defect.

The Plaintiffs suggest that their evidence of defect was uncontroverted. The Defendant argues, however, "[t]he law does not require defendant to put on evidence to rebut plaintiffs' theory. Plaintiffs had the burden of proof on defective condition...." Bayliner's Br. at 20. Moreover, the district court stated, and the majority agrees, "that the proper duty of the jury [was] to accept or reject testimony in whole or in part, ..." in referring to the jury instructions. J.A. at 43. As partially noted on page 794 of the majority opinion, the jury instructions read:

In weighing the effects of a discrepancy always consider whether it pertains to a matter of importance or an unimportant detail and whether the discrepancy results from innocent error or intentional falsehood. After making your own judgment, you will give the testimony of each witness such weight, if any, as you may think it deserves. You may in short, accept or reject the testimony of any witness in whole or in part.

J.A. at 210.

These instructions seem to indicate that the jury was free to disregard, in its entirety, the evidence of defect presented by Plaintiff, even if uncontested. Certainly, a jury has that right. *See Quock Ting v. United States,* 140 U.S. 417, 11 S.Ct. 733, 35 L.Ed. 501 (1891); *Sheppard v. Maxwell,* 346 F.2d 707, 726 (6th Cir.1965), *rev'd on other grounds,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Nevertheless, we must balance the sovereign right of the jury to weigh the evidence and reach a verdict, against the responsibility of the court to reject that verdict if it is not supported by the evidence. These two responsibilities coexist in the Seventh Amendment, as they were recognized in common law.[1] Consequently, it is my opinion that a jury may disregard all evidence presented by a litigant, even uncontroverted evidence, to reach its verdict. It is, however, the responsibility of the court to insure that the jury faithfully and lawfully executes its duty as the fact finder. If the evidence clearly points to a single conclusion, which is the only reasonable conclusion, and the jury adopts an alternate view, it is incumbent on the court to protect the process and award a judgment as a matter of law. In this case the *relevant* evidence pointed to only one logical conclusion—that the boat was defective. A judgment as a matter of law should have been granted on the issue of defect.

## II

The standard for reviewing the district court's denial of a motion for new trial is abuse of discretion. Plaintiffs assert that the court abused it discretion by relying on evidence not related to issues presented (evi-

---

1. "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial be jury shall be preserved, and no fact tried by jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. Amend. VII.

dence of proximate cause) in ruling on its motion. I agree. With respect to the defective product claim, because I believe that the jury's verdict is opposite the only reasonable conclusion, a judgment as a matter of law was proper and a new trial is not necessary on that issue. With respect to the negligence claims, however, a new trial is in order because the jury's verdict is against the great weight of the evidence and the district court abused its discretion on review. The court's references to irrelevant evidence are substantial because they demonstrate that the court engaged in an errant analysis of the issues and application of the law. The court was charged to determine whether there was substantial evidence to support the jury's special verdicts regarding product defect and negligence. The court responded that there was substantial evidence and went on to insinuate that the substantial evidence was that of negligence of the parties on the boat. Again, I believe this evidence relates to proximate cause and comparative negligence, issues which the jury never reached, and not defect or negligence. Accordingly the court's reliance on this evidence is a clear error in judgment and abuse of discretion. *See Davis v. Jellico Community Hosp. Inc.*, 912 F.2d 129, 132 (6th Cir.1990). A new trial should have been granted on the issue of negligence and other unresolved issues.